**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LISA CARR | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 23-1993 |
| TRAVELERS HOME AND MARINE | : | |
| INSURANCE COMPANY | : | |

**SURRICK, J.**                                                    **October 31, 2023**

<u>**MEMORANDUM**</u>

        Presently before the Court is Defendant Travelers' Motion to Dismiss the Complaint.

("Mot.," ECF No. 4.)  For the following reasons, the Motion is granted.  This case involves a

settlement dispute between Lisa Carr and her insurer, Travelers Home and Marine Insurance

Company ("Travelers").  After being injured in a car accident, Carr filed a claim with Travelers

under her automobile insurance policy for underinsured motorist ("UIM") benefits.  The parties

engaged in an extensive back and forth over the course of more than two years in which

Travelers ultimately made three settlement offers, each of which was rejected by Carr and her

counsel.  The parties' dispute was eventually submitted to arbitration, and Carr was awarded

$100,000, the maximum UIM benefit under her policy.  Carr filed a complaint in the Court of

Common Pleas of Philadelphia County against Travelers, alleging common law bad faith, a

statutory bad faith claim under 42 Pa. Stat. § 8371 ("Section 8371"), and a claim under the

Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1 et seq.

("UTPCPL").  Travelers removed the case to this Court and filed a motion to dismiss each claim.

For the following reasons, each claim is dismissed.  First, the common law bad faith claim is

barred by res judicata.  Second, the statutory bad faith claim does not raise a plausible claim for

relief. Finally, the consumer protection law claim is not actionable based on the conduct alleged here.

## I.    BACKGROUND

In her complaint, Plaintiff alleges the following:

On September 20, 2017, Plaintiff Lisa Carr was in the front passenger seat of a Honda Civic that was rear-ended by a Hyundai station wagon traveling at a high rate of speed. ("Compl.," ECF No. 1-7, ¶ 6.)  As a result of the collision, Carr sustained several serious and permanent injuries.  (*Id.* ¶ 7.)  Following the collision, Carr made a claim against the driver of the Hyundai and the driver's insurer, Geico.  (*Id.* ¶ 13.)  On August 8, 2019, Carr finalized a settlement with Geico for $15,000, the benefit limit under that policy.  (*Id.* ¶¶ 10, 18.)

At the time of the accident, Carr, together with her sister Amy Carr, had UIM coverage with defendant Travelers that provided $100,000 in benefits.[1]  (*Id.* ¶¶ 11–12.)  Following her settlement with Geico, Carr filed a claim with Travelers for UIM benefits under her policy.  (*Id.* ¶ 19.)  On June 6, 2019, Carr's counsel, Adam Soll, discussed Carr's injuries with Mark Scott, a claim representative for Travelers.  (*Id.* ¶ 20.)  The next day, Soll sent Scott an email with a demand to settle Carr's claim for the UIM policy limit of $100,000 along with a previous email that he had sent to Geico describing Carr's injuries.  (*Id.* ¶ 21.)  Soll went on to send Scott a letter, accompanied with Carr's medical records, and an email, each reiterating Carr's settlement demand.  (*Id.* ¶¶ 22–23.)  On August 5, 2019, Soll and Scott again discussed Carr's claim over the phone, during which Scott represented that Travelers assessed the value of Carr's claim to be

---

[1] "The purpose of underinsured motorist coverage 'is to protect the insured . . . from the risk that a negligent driver of another vehicle will cause injury to the insured . . . and will have inadequate liability coverage to compensate for the injuries caused by his negligence.'"  *Nonemacher v. Aetna Cas. & Sur. Co.*, 710 F. Supp. 602, 607 (E.D. Pa. 1989) (quoting *Myers v. State Farm Ins. Co.*, 842 F.2d 705, 709–10 (3d Cir. 1988)).

$20,000, of which Geico had already paid $15,000.  (*Id.* ¶ 24.)  Soll disputed Travelers'

evaluation and represented that he would provide Travelers with "additional support" regarding

Carr's injuries.  (*Id.* ¶ 25.)

On January 6, 2020, Soll mailed Scott a narrative report prepared by a neurologist that

addressed Carr's medical history, injuries, and the findings of his physical examination of Carr,

as well a separate document prepared by Soll containing descriptions of Carr's injuries and their

impact on her life.  (*Id.* ¶¶ 27–29.)  Two days later, Soll and Scott spoke over the phone again.

(*Id.* ¶ 31.)  Scott asked Soll what Carr was "looking for" and Soll reiterated that Carr was seeking

the policy limit of $100,000.  (*Id.*)  Scott stated that he would "talk to his people" and get back to

Soll.  (*Id.*)

On January 31, 2020, Joseph Birmingham, an attorney for Travelers, called Soll and

represented that he had been assigned to legally represent Travelers in Carr's claim.  (*Id.* ¶ 43.)

After discussing the claim, Birmingham stated that "it appeared to have value" and represented

that he would discuss Carr's case with Scott and get back to Soll to discuss it further.  (*Id.*)  On

March 16, 2020, Birmingham mailed Soll a letter acknowledging his representation of Travelers

and expressing an intention to schedule a taking of Carr's statement under oath once he had the

opportunity to review her medical records.  (*Id.* ¶ 44.)

Throughout 2020 and into 2021, Carr received medical care from four different doctors,

consulted with a fifth, and participated in a course of physical therapy.  (*Id.* ¶¶ 46–51.)  On

January 27, 2021, Soll mailed Birmingham more of Carr's medical records along with a narrative

report authored by one of Carr's treating physicians detailing his diagnosis of her condition and

his recommendation for treatment.  (*Id.* ¶¶ 52–53.)  Soll also attached a letter reiterating Carr's

demand that her claim be settled for $100,000 and requesting that Birmingham respond within

thirty days.  (*Id.* ¶ 54.)  Neither Birmingham nor any other representative of Travelers responded to Soll's letter.  (*Id.* ¶¶ 55–57.)

On April 8, 2021, Soll left Birmingham a voice message requesting a response to his letter.  (*Id.* ¶ 58.)  On April 15, Birmingham informed Soll that he was unable to respond to the settlement demand until he had an opportunity to speak with Scott and represented that he would do so and call Soll by the following Monday, April 19.  (*Id.* ¶ 59.)  After not receiving a response by Monday, Soll emailed Birmingham on Tuesday, April 20, requesting a response.  (*Id.* ¶ 60.) The same day, Birmingham told Soll over the phone that he was still waiting to hear from Scott and would call Soll back on Thursday, April 22.  (*Id.* ¶ 61.)  Soll did not hear from Birmingham on Thursday and sent him and email asking for "an explanation regarding Travelers continued delay in evaluating the claim."  (*Id.* ¶ 62.)

On May 5, 2021, Soll spoke over the phone with Scott during which Scott increased Travelers' settlement offer from $5,000 to $40,000.  (*Id.* ¶ 63.)  During that call, Scott stated that Carr's claim "posed a danger" and could be found to have a value exceeding the $100,000 policy limit.  (*Id.*)  Soll did not accept Scott's offer and told him that he would be sending him additional treatment records and reports "confirming the severity and permanency" of Carr's injuries.  (*Id.* ¶ 64.)  Scott responded that he would have these records and reports reviewed by a nursing expert and contact Soll in approximately two weeks.  (*Id.*)  The following day, Soll sent Scott and Birmingham an email with the promised records as well as an additional narrative report from Carr's most recent treating physician.  (*Id.* ¶ 65.)  On May 12, Soll sent Birmingham a letter, copying Scott, with Carr's description of her ongoing treatment and disabilities as well as a supporting photograph.  (*Id.* ¶¶ 67–68.)  He concluded by emphasizing that he and Carr valued the claim in excess of the policy limits and stated that he "anticipate[d] hearing from

[Birmingham] within the next ten days." (*Id.* ¶ 69.)  Neither Birmingham nor any other representative of Travelers responded. (*Id.* ¶ 70.)

On June 16, 2021, Soll sent Travelers a written demand to arbitrate the claim. (*Id.* ¶ 77.) Keith Mason, who had assumed responsibility for representing Travelers from Birmingham, responded to Soll on June 18 and requested that Carr be examined under oath and be given an independent medical examination and represented that these matters "would be expeditiously scheduled." (*Id.* ¶ 78.)  An examination under oath was eventually scheduled for August 31 and an independent medical examination for September 30.[2] (*Id.* ¶¶ 80, 82.)  On September 9, after Mason had completed his examination of Carr under oath, Mason stated to Soll over the phone that he believed Carr was credible and would make a good impression before a panel of arbitrators. (*Id.* ¶ 87.)

On October 5, Travelers, through Mason, produced a medical report from Dr. Richard Levenberg, who had performed the scheduled medical examination on Carr. (*Id.* ¶ 88.)  In that report, Dr. Levenberg assessed Carr to be "at maximum medical improvement without the need for ongoing testing or treatment." (*Id.* ¶ 88.)  Dr. Levenberg also requested certain of Carr's MRI films; however, Travelers never delivered those films to Dr. Levenberg. (*Id.* ¶¶ 88–90.) On October 10, Mason stated to Soll that Travelers was "resolved to defend the claim" based on Dr. Levenberg's diagnosis. (*Id.* ¶ 91.)  Over the next two weeks, Soll sent Mason updated medical records as well as a medical cost projection, which projected Carr's future care to cost $327,586.33. (*Id.* ¶¶ 92–95.)

On October 26, 2021, Chris Carling assumed responsibility for handling Carr's claim on behalf of Travelers. (*Id.* ¶ 96.)  Carling sent an email to Soll the next day increasing Travelers

---

[2] The examination in fact took place on September 23, 2021. (*Id.* at Ex. 21.)

offer to $50,000, which was rejected by Carr.  (*Id.* ¶¶ 97–98.)  He also attached a report by Dr. David Lobas, a neurologist, who suggested that Carr did not suffer a concussion based on his review of her records.  (*Id.* ¶¶ 99–100.)  This was in contrast to the opinions of Carr's treating physicians.  (*Id.* ¶ 100.)

On November 3, 2021, the arbitration of Carr's claim was conducted before a panel of three arbitrators.  (*Id.* ¶ 102.)  The panel ultimately awarded Carr $500,000, of which Travelers paid $100,000, the limit under Carr's policy.  (*Id.* ¶¶ 106–07.)

On April 25, 2023, Carr filed a complaint with the Court of Common Pleas of Philadelphia County, asserting three causes of action against Travelers: common law bad faith ("Count I"), statutory bad faith, 42 Pa. Stat. § 8371 ("Count II"), and a violation of the UTPCPL ("Count III").  (*Id.* ¶¶ 110–44.)  On May 24, 2023, Travelers removed the case to federal court pursuant to 28 U.S.C. § 1441, asserting diversity jurisdiction under 28 U.S.C. § 1332, ("Ntc. of Rem.," ECF No. 1, at 1), and filed this motion to dismiss a week later, (Mot.).

## II.     LEGAL STANDARD

When considering a motion to dismiss under F.R.C.P. 12(b)(6) ("failure to state a claim upon which relief can be granted"), a court engages in a two-part analysis.  First, the factual and legal allegations are separated; second, legal conclusions are disregarded.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a 12(b)(6) motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In order to survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* That

is to say, "[f]actual allegations must be enough to raise a right to relief above the speculative

level." *Twombly*, 550 U.S. at 555. "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Iqbal*, 556 U.S. at 678. Ultimately, determining whether a complaint states a plausible claim is

"a context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Id.* at 679.

Carr maintains that "[c]ourts will grant a motion to dismiss 'only if it is clear that no

relief could be granted under any set of facts that could be proved consistent with the

allegations.'" ("Resp.," ECF No. 6, at 10 (citing *Hishon v. King & Spaulding*, 467 U.S. 69, 73

(1984)).) However, the Supreme Court explicitly retired this more deferential standard *Twombly*

and *Iqbal*. *See Iqbal*, 550 U.S. at 670.

## III.   ANALYSIS

### A.   Count I: Common Law Bad Faith

In Count I, Carr alleges that Travelers violated its common law duty to act in good faith.

To the extent that Carr alleges a *tortious* violation of this duty, she does not present an actionable

cause of action. It is well-established that "Pennsylvania does not recognize a cause of action for

breach of good faith and fair dealing sounding in tort." *Purvi, LLC v. Nat'l Fire & Marine Ins.

Co.*, No. CV 19-4250, 2019 WL 6117356, at *3 (E.D. Pa. Nov. 18, 2019); *see also UPMC

Health System v. Metro. Life Ins. Co.*, 391 F.3d 497, 505 (3d Cir. 2004) (citing *D'Ambrosio v.

Pa. Nat'l Mutual Cas. Ins. Co.*, 431 A.2d 966, 970 (Pa. 1981)) ("The Pennsylvania Supreme

Court [has] held that there is no common law remedy for bad faith on the part of insurers.").

"Under Pennsylvania law, bad faith by an insurance company can give rise to two separate causes of action: a breach of contract action for violation of an insurance contract's implied duty of good faith, and a statutory action under the terms of Pennsylvania's bad faith statute, [Section 8371]." *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 496–97 (3d Cir. 2015). "With respect to a breach of contract action, Pennsylvania courts have held that the common law duty of good faith and fair dealing is implied in every contract." *Pommells v. State Farm Ins.*, No. 18-5143, 2019 WL 2339992, at *6 (E.D. Pa. 2019) (internal quotations omitted). Consequently, "courts have consistently concluded that a plaintiff cannot bring a freestanding common law bad faith claim and a separate breach of contract claim, as the former is subsumed within the latter." *Id.* (collecting cases).

To the extent that Carr suggests that her common law bad faith claim amounts to a breach of contract claim, (*see* Resp. at 10–16), that claim is barred under the principle of res judicata. "Res judicata, or claim preclusion, prohibits parties involved in prior, concluded litigation from subsequently asserting claims in a later action that were raised, or could have been raised, in the previous adjudication." *Wilkes ex rel. Mason v. Phoenix Home Life Mut. Ins. Co.*, 902 A.2d 366, 376 (Pa. 2006) (emphasis added). Carr voluntarily submitted to arbitration to adjudicate what she was owed under the terms of her policy with Travelers. She had the opportunity to raise her common law bad faith claim there, as it was subsumed within her breach of contract claim and it only concerned alleged conduct that occurred before the arbitration proceeding. She cannot now bring that claim in a judicial adjudication. *See Clientron Corp. v. Devon IT, Inc.*, 154 F. Supp. 3d 132, 145 (E.D. Pa. 2015) (citing the Restatement (Second) of Judgments § 84 (1982)) (a valid and final arbitration award has the same effect under the rules of res judicata as a judgment of a court); *Fineman, Krekstein & Harris, P.C. v. Perr*, 278 A.3d 385, 399 n.3 (Pa. Super. 2022)

(Bowes, J., concurring in part and dissenting in part) ("Pursuant to existing precedent, an arbitration award is considered a final judgment on the merits of the issues arbitrated for purposes of res judicata and collateral estoppel.").[3]  Accordingly, Count I is barred and is dismissed with prejudice.

### B.    Count II: Statutory Bad Faith

In Count II, Carr alleges that Travelers is also liable for its alleged bad faith under Section 8371, Pennsylvania's statutory bad faith cause of action.  In order to show bad faith on the part of an insurer under that statute, and insured must demonstrate that (1) the insurer did not have a reasonable basis for denying benefits under the relevant policy, and (2) the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the insured's claim.  *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 377 (Pa. 2017).  In other words, bad faith on part of an insurer "is a frivolous or unfounded refusal to pay" a claim.  *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999).  Bad faith can also be shown by lack of investigation into the facts of a claim or a failure to communicate with a claimant.  *Bussie v. Am. Sec. Ins. Co.*, No. 20-3519, 2021 WL 2206282, at *6 (E.D. Pa. June 1, 2021).

While Carr's allegations lay out a *possibility* that Travelers behaved in a way that meets the standard of bad faith under Section 8371, they ultimately do not rise to the level that makes it *plausible* that Travelers did so.  *See Ashcroft v. Iqbal*, 556 U.S. at 678.  Importantly, Carr's complaint contains a litany of the kind of conclusory allegations and threadbare recitals of a

---

[3] It is unclear from the complaint whether or not Carr argued at the arbitration that Travelers engaged in bad faith.  *See Brody v. Hankin*, 145 F. App'x 768, 769–70 (3d Cir. 2005) (a court may grant a Rule 12(b)(6) motion to dismiss based on an affirmative defense, such as claim preclusion, only if the predicate establishing that defense is evident on the face of the complaint).  However, this question is immaterial to the res judicata analysis, as any claim which was both made or could have but was not made at a prior adjudication is precluded.

cause of action that are plainly insufficient to survive a motion to dismiss.  *See id.*  For example,

Carr alleges that Travelers acted in bad faith by

> engaging in unfair or deceptive acts or practices . . . failing to fully, fairly and
> promptly investigate the claims of the plaintiff . . . failing to fully, fairly and
> promptly evaluate the claims of the plaintiff . . . failing to effectuate a prompt and
> fair settlement . . . acting in a dilatory and obdurate manner in the handling of the
> underinsured motorist claims . . . breaching the duties of good faith and fair
> dealing . . . [and] fail[ing] to settle the claims of the plaintiff . . . with knowing
> and reckless disregard of its lack of a reasonable basis for failure to do so[,]

among other similarly conclusory reasons.[4]  (Compl. ¶¶ 134–35.)

Critically, Carr's factual allegations do not provide sufficient support to her claim of bad

faith for this claim to survive a motion to dismiss.  These allegations essentially amount to

frustration that Travelers provided settlement offers that were lower than she desired, responded

more slowly and less frequently than she would have liked, and relied on its own experts.

However, Carr's allegations do not on their face paint a picture of Travelers knowingly or

recklessly disregarding a lack of a reasonable basis for denying Carr's claim.

To the extent Carr alleges that Travelers engaged in bad faith by making unreasonably

low settlement offers, she does not make a cognizable claim of bad faith.  "'[B]ad faith is not

present merely because an insurer makes a low but reasonable estimate of an insured's

damages.'"  *Smith v. State Farm Mut. Auto. Ins. Co.*, 506 F. App'x 133, 136 (3d Cir. 2012)

(quoting *Johnson v. Progressive Ins. Co.*, 987 A.2d 781, 784 (Pa. Super. Ct. 2009)).  Nor does

"the failure to immediately accede to a demand for the policy limit . . . without more, amount to

bad faith" under Section 8371.  *Id.* at 137.  Travelers' settlement offers of $5,000, $40,000, and

---

[4] Carr further alleges that Travelers acted in bad faith by violating Pennsylvania's Unfair
Insurance Practices Act, 40 P.S. § 1171.1 et seq., and Unfair Claims Settlement Practices
Guidelines, 31 Pa. Code § 146.1 et seq.  (Compl. ¶¶ 134.)  However, "a violation of the UIPA or
the UCSP is not a per se violation of the bad faith standard."  *Dinner v. United Servs. Auto. Ass'n
Cas. Ins. Co.*, 29 F. App'x 823, 827 (3d Cir. 2002).

$50,000, while all considerably lower than the ultimate award of $100,000, were not

unreasonable in light of the fact that Traveler's increased its offer considerably from $5,000 to

$40,000 (and eventually $50,000) after being given the chance to review new medical records

sent by Soll.  Notably, in *Zappile v. AMEX Assurance Co.*, the arbitration award under an

underinsured motorist policy was "roughly $70,000 more than the offer," yet the court reversed

the trial court's finding of bad faith under Section 8371, holding that "[a] difference between the

offer and the amount awarded is not, by itself, evidence of bad faith."  928 A.2d 251, 261 (Pa.

Super. 2007); *see also Insetta v. First Liberty Ins. Corp.*, No. 14-1890, 2015 WL 1279479, at *4

(E.D. Pa. Mar. 20, 2015) (quoting *Johnson*, 987 A.2d at 785) (disagreements over the damages

suffered by an insured are routine, and "[i]n such situations, an arguably low offer is not

indicative of bad faith because 'a low but reasonable estimate of an insured's damages' does not

constitute an actionable bad faith claim under § 8371"); *Dattilo v. State Farm Ins. Co.*, 1997 WL

644076 (E.D. Pa. 1997) (granting summary judgment for insurer on a Section 8371 claim where

the highest offer was about an eighth of the eventual arbitration award).  Here, Travelers

eventually offered to settle Carr's claim for $50,000, which was itself $50,000 less than (and

fifty percent of) the ultimate award.  This is not evidence of bad faith by Travelers.

Nor does Travelers' level of responsiveness to Soll's settlement demands support a

plausible claim of bad faith under Section 8371.  Significantly,

> a long period of time between demand and settlement does not, on its own,
> necessarily constitute bad faith.  Rather, courts have looked to the degree to which
> a defendant insurer knew that it had no basis to deny the claimant; if delay is
> attributable to the need to investigate further or even to simple negligence, no bad
> faith has occurred.

*Kosierowski v. Allstate Ins. Co.*, 51 F.Supp.2d 583, 589 (E.D.Pa.1999).  Moreover, "[w]hether

something is untimely . . . may be an element of a bad faith claim only to the extent that it itself

has sufficient support; otherwise, an allegation that a claim was not timely paid and investigated

is a legal conclusion which a court must disregard at a motion to dismiss stage." *Meyers v.*

*Protective Ins. Co.*, No. 3:16-CV-01821, 2017 WL 386644, at *9 (M.D. Pa. Jan. 27, 2017).

   Within two months of Soll first reaching out to Travelers regarding Carr's claim, and

after receiving and evaluating medical records sent by Soll, Travelers communicated to Soll its

evaluation of Carr's claim and provided its first settlement offer.  (*See id.* ¶¶ 20–24.)  Carr and

Soll rejected this offer, and Soll promised to provide Travelers with "additional support"

regarding Carr's injuries.  (*Id.* ¶ 25.)  Five months went by before Soll sent Travelers this

additional support, after which Scott, on behalf of Travelers, said it would get back to Soll after

discussing the matter further with colleagues.  (*See id.* ¶¶ 27–31.)  Just a few weeks later,

Birmingham contacted Soll to acknowledge his representation of Travelers and recognized that

Carr's claim had merit.  (*Id.* ¶ 43.)  About a month and a half later, Birmingham sent Soll a letter

stating that he would be in touch again once he had the chance to review her medical records and

intended to take Carr's statement under oath.  (*Id.* ¶¶ 44.)  Neither party reached out to the other

for several months after this.  While Birmingham did not get back in touch with Soll, Soll did not

send Birmingham additional medical records until ten months after their last call.  (*See id.* ¶¶ 52–

53.)  Along with sending those records, Soll again demanded that Travelers settle the claim for

the policy limits and respond to Soll within thirty days.  (*Id.* ¶ 54.)

   Birmingham did not meet the deadline imposed by Soll, but Birmingham eventually

responded to a voicemail left by Soll two plus months later.  (*Id.* ¶¶ 55–59.)  Over the next two

weeks, the two had a back and forth where Birmingham emphasized, to Soll's dissatisfaction,

that he was waiting to confer with Scott before he could respond to Soll's demand.  (*Id.*

¶¶ 58–62.)  About two weeks after this exchange ended, Scott raised Travelers' settlement offer

from $5,000 to $40,000, acknowledging the potential merit of Carr's claim.  (*See id.* ¶ 63.)  Soll rejected this offer, sent Travelers additional medical records, and requested a prompt response, which he did not receive.  (*Id.* ¶¶ 64–70.)  About a month later, Soll sent Travelers an arbitration demand.  (*Id.* ¶ 77.)

This timeline does not suggest that Travelers engaged in a "dilatory and obdurate manner" towards Carr, (*see* Compl. ¶ 134), or failed to make a good faith investigation into the facts of her case, *see Bussie*, 2021 WL 2206282, at *6.  While Travelers was somewhat unresponsive at times, its response times were not excessive when compared to Soll's, particularly the five months it took Soll to send Travelers additional records to support Carr's claim.  Travelers was certainly under no obligation to act according to the deadlines Soll unilaterally imposed.  Although Travelers never followed through with its express intention to take Carr's statement under oath until after her arbitration demand, this, without more, is not evidence of bad faith.  It would not be unreasonable for Travelers to prioritize taking Carr's statement once the threat of arbitration loomed.  Ultimately, Carr has not provided sufficient factual support to make a plausible, non-speculative claim that Travelers knew or recklessly disregarded that it had no reasonable basis to deny Carr what she was seeking.

Finally, to the extent Carr argues that Travelers engaged in bad faith by placing more credence in its own experts compared to hers, that does not support a claim for bad faith under Section 8371.  An insurer is under no obligation to accept the determinations of the insured's treating physicians at face value.  *Richardson v. United Fin. Cas. Co.*, No. 11-7688, 2013 WL 2357519, at *9 (E.D. Pa. 2013).  Moreover, the fact that Carr takes issue with how Dr. Lobas and Dr. Levenberg conducted their evaluations of her injuries and the ultimate conclusions they reached is not evidence that Travelers knowingly or recklessly disregarded a lack of a reasonable

basis for rejecting Carr's settlement demands. *See Zinno v. Geico Gen. Ins. Co.*, No. 16-792, 2016 WL 5100540, at *3 (E.D. Pa. Sept. 19, 2016) ("Plaintiff's allegation . . . that Defendant's expert reached an opposite conclusion as his own experts . . . does not lead to a non-speculative inference of bad faith."). Travelers was well within its rights to rely on its own experts. Nor is the fact that Travelers never seemingly provided Dr. Levenberg with the MRI films he requested, without more, evidence of bad faith. Again, Carr has not presented a plausible claim of bad faith.

Ultimately, while Carr's allegations "perhaps suggest that a bad faith claim is possible, they do not allow for any non-speculative inference that a finding of bad faith is plausible." *Pasqualino v. State Farm Mut. Auto. Ins. Co.*, No. 15-0077, 2015 WL 3444288, at *5 (E.D. Pa. May 28, 2015). They ultimately amount to another in a line of bad faith claims that "[c]ourts in this Circuit have routinely dismissed[,] . . . reciting only 'bare-bones' conclusory allegations that are not accompanied by factual allegations sufficient . . . to survive a Rule 12(b)(6) motion to dismiss." *Camp v. New Jersey Mfrs. Ins. Co.*, No. 16-1087, 2016 WL 3181743, at *4 (E.D. Pa. June 8, 2016). While Carr's complaint may have been sufficient to survive a Rule 12(b)(6) motion under the old "no-set-of-facts" test, *see Iqbal*, 550 U.S. at 670, it does not suffice today. Accordingly, Count II is dismissed without prejudice.

### C.      Count III: Consumer Protection

In Count III, Carr alleges that Travelers' conduct with regards to her UIM claim violated Pennsylvania's consumer protection statute, the UTPCPL. Travelers argues that the UTPCPL does not apply to this matter, as the "[m]ere refusal to pay a claim, or failure to investigate or take other action, is nonfeasance and is, thus, not actionable" under this law. *Nordi v. Keystone*

*Health Plan West, Inc.*, 989 A.2d 376, 385 (Pa. Super. Ct. 2010).  As this Court held a few years ago,

> The insurance bad faith statute applies to post-contract formation conduct.  The UTPCPL, on the other hand, applies to conduct surrounding the insurer's pre-formation conduct.  The UTPCPL applies to the sale of an insurance policy.  It does not apply to the handling of insurance claims. . . . Rather, § 8371 provides the exclusive statutory remedy applicable to claims handling.

*Kelly v. Progressive Advanced Ins. Co.*, 159 F. Supp. 3d 562, 564 (E.D. Pa. 2016).

In any event, because Carr did not respond at all to Travelers' arguments with regard to Count III in its response, she has waived this claim.  *See Markert v. PNC Fin. Servs. Grp., Inc.*, 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011) ("Where an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue.").  Consequently, Count III is dismissed with prejudice.

## IV. CONCLUSION

For the forgoing reasons, Defendant's Motion is granted.  Counts I and III are dismissed with prejudice.  Count II is dismissed without prejudice.

An appropriate order follows.

**BY THE COURT:**


*/s/ R. Barclay Surrick*
**R. Barclay Surrick, J.**